INGRAM, Justice.
Proctor-Russell Tractor Company, Inc. (hereinafter “Proctor-Russell”), sued Ford New Holland, Inc. (hereinafter “Ford”), alleging fraud and breach of contract. A jury returned a verdict in favor of Proctor-Russell on the fraud claim and awarded it $65,-000 in compensatory damages and $200,000 in punitive damages. Ford appeals, arguing, inter alia, that the evidence presented by Proctor-Russell was insufficient to support the jury’s verdict in its favor and, therefore, that the trial court erred in denying Ford’s motion for J.N.O.V.
A motion for J.N.O.V. is to be granted only when the court, considering all reasonable inferences in the light most favorable to the nonmovant, concludes that there is a complete absence of proof on a material element or that there is no factual controversy upon which reasonable people could differ, and that the movant is entitled to a judgment as a matter of law. Baptist Memorial Hospital v. Bowen, 591 So.2d 74 (Ala.1991). A motion for J.N.O.V. is tested by the purely objective standard of whether the party having the burden of proof has produced evidence creating a fact question requiring resolution by the jury. Smith v. MBL Life Assurance Corp., 589 So.2d 691, 696 (Ala.1991). In other words, when a party moves for a J.N.O.V. on the ground that an element has not been proven, the denial of the motion is sustainable only if there is sufficient evidence to support the challenged element of the claim. Hollis v. Tomlinson, 585 So.2d 862 (Ala.1991).
The evidence presented by Proctor-Russell, viewed in the light most favorable to Proctor-Russell, is as follows: In 1986, Proctor-Russell, a tractor dealer located in Scottsboro, signed a. three-year dealer agreement with Ford; that agreement provided, inter alia, that “[t]he Dealer [Proctor-Russell] may terminate this agreement at any time at will by giving the Company [Ford] at least 30 days prior notice.” Either party could terminate if the other party breached the agreement. However, Ford could terminate, if it gave 30 days’ notice, only “in the event [Ford] offer[ed] a new or amended form of agreement to its authorized dealers,” or for certain improper business activity by the dealer, specifically stated in the contract. The contract also provided that Ford would “give [Proctor-Russell] written notice of any market representation plan that [did] not provide for the continuation of representation of products from the déaler location and any branch locations.” (Emphasis added.)
The agreement was to be effective from August 28,1987, until December 31,1990. It specifically provided for notice of either party’s intention not to extend the contract past its expiration date of December 31,1990; the agreement specifically stated that such notice must be given “at least six months prior to the initial expiration date.”
In July 1988, Cliff Russell, part-owner and manager of Proctor-Russell, received a letter from Ford, which stated:
“As indicated in Paragraph 18(a) of your Dealer Agreement with Ford New Holland, Inc., for planning purposes, Ford New Holland drafts market representation plans which generally describe the dealer network that we would like to have in the long term. Of course, implementation of market representation plans is always subject to contractual commitments and other legal duties which Ford New Holland is committed to honor.
*397 “Paragraph 18(a) of the Dealer Agreement states that Ford New Holland will give you written notice of any market representation plan that does not provide for the continuation of representation of products from the Dealer' Location and any Branch Locations, as those terms are defined in the Dealer Agreement. This letter is written notice that the current market representation plan contemplates no dealer at your Dealer Location.
“Nonetheless, Ford New Holland, Inc., intends to honor the terms and conditions of the Dealer Agreement with you, and any applicable statutes. This is not a termination notice and your Dealer Agreement will not he terminated except for reasons set forth in the Dealer Agreement or applicable law. Our relationship will continue under the written Dealer Agreement unless and until grounds for termination arise. If you have any questions, please contact your zone manager or the Branch Market Representation Manager, Walter A. Gibson....”
(Emphasis added.)
Russell testified that he was confused by the letter and thought the letter might mean that he was being put on notice that his dealer contract was not likely to be renewed when it expired. Russell testified that, upon receiving the letter, he asked Robert Hendrix, the zone manager for Proctor-Russell’s area, what the letter meant and, Russell testified, Robert Hendrix was very “evasive” and told him that the letter meant simply what it said. Russell’s only inquiries as to Ford’s intent to renew were directed to Hendrix.
During the remainder of the summer of 1988 and through the fall, Russell, according to his testimony, repeatedly inquired about the letter and whether his dealer agreement would be renewed. On December 13, 1988, according to Russell’s testimony, Hendrix came to Proctor-Russell and demanded that Russell either make reservations to attend a Ford parts show or that he resign as a Ford dealer. Russell testified that, because he was frustrated and anxious regarding the future of his business and had not received an answer from Hendrix about the future status of the dealer agreement, Russell wrote out what he called an “involuntary” resignation letter. Russell also testified that, before receiving Hendrix’s “ultimatum,” Russell had had no intention of terminating the dealer agreement before its expiration, and that, when Hendrix gave him the choice between attending the parts show and resigning, he did not believe that Hendrix had the authority to issue or act on that “ultimatum.”
Russell also testified that he understood that, before the dealer agreement was signed in August 1987, he did not have a contractual commitment from Ford as to how long he would be a dealer and that the dealer agreement provided a contractual commitment for only three years. Russell testified:
“Q. ... Before the [dealer agreement] was signed, your dealership operated under a written contract, didn’t it?
“A. That’s correct.
“Q. That was renewed from year to year?
“A. It was — well, the last one I had signed, I think was in ’74.
“Q. Okay; and it simply carried on forward?
“A. That’s correct.
“Q. And, there was no provision in that contract that said that either party had to have cause to terminate it, was there?
“A. That’s correct.
“Q. So, throughout those years, you functioned without any commitment from Ford as to how long you would be a dealer, isn’t that correct?
“A. That’s right.
“Q. No contractual commitment?
“A. Right.
“Q. In the [last dealer agreement], you had a commitment from Ford that you would be a dealer until December 31, 1990, didn’t you?
“A. That’s correct.
“Q. And, that’s a longer commitment than you had had in the past, wasn’t it?
“A. Right.
“Q. Now, in talking with Robert Hendrix and inquiring of Robert Hendrix *398 about your status, what did you want him to tell you?
“A. I wanted him to tell me what Ford’s future — what the letter meant and what the future plans were for Scottsboro.
“Q. Well, did you want to know whether you were going to be terminated within the next few months?
“A. I didn’t know whether we would be terminated or whether, in fact, we would be able to get the New Holland contract, which I had talked to them about, or whether we would' be non-renewed at the end of the contract, you know, I needed something to make future plans to be able to survive before my family and myself and my employees, and I think it was a very simple question what I asked him, sir.
“Q. Okay; one of the things you were concerned about was that Ford was about to terminate you, is that right?
“A. I didn’t know, you know, I’ve answered that several times; I don’t know what they were trying to do.
“Q. Well, I guess, Mr. Russell, what I’m getting at is why you had this in your mind that you were entitled to some special treatment?
“A. I don’t know if it was special treatment; I just asked the question.
“Q. Well, the reason I say special treatment, up until you signed this contract, you had no assurance from time to time that you would be a dealer, is that right?
“A. I never got a letter like that either, sir.
“Q. But, as a matter of fact, you had no assurance, is that right?
“A. Well, according to the contract, no, sir; but, I had never gotten a letter or anything like that that I had to sign.”
Proctor-Russell’s fraud claim is based upon its allegation that Russell terminated the dealer agreement and caused Proctor-Russell to suffer damage because he “could not get an answer to what [Ford’s] plans were and [he] could make no plans.” Proctor-Russell argues that Ford owed it a duty to disclose its intention regarding the renewal of the dealer agreement and that Ford’s failure to disclose its intention constitutes fraudulent concealment.
This case was submitted to the jury on the plaintiffs theory that Ford had fraudulently suppressed a material fact that it was under a duty to disclose and had thereby forced Russell to terminate the contract early. Ford had moved for a judgment notwithstanding the verdict, arguing, inter alia, that the plaintiffs evidence was insufficient to support a jury verdict in favor of Proctor-Russell on its claim of fraudulent suppression. The trial court denied the motion for J.N.O.V.
“Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action.” § 6-6-100, Ala.Code 1976. “Fraud” may be committed by “[m]isrepre-sentations of a material fact,” see § 6-5-101; or by “[suppression of a material fact which the party is under an obligation to communicate,” see § 6-5-102. Proctor-Russell alleged that it was defrauded by fraudulent suppression on the part of Ford. In order to recover for fraudulent suppression, Proctor-Russell had to prove: (1) that Ford’s intention, regarding renewal or nonrenewal of the dealer agreement when it expired in December 1990, was an existing, material fact; (2) that Ford had a duty to disclose its intention; (3) that Ford’s failure to disclose its intention induced Proctor-Russell to act, i.e., created a false impression upon which Proctor-Russell relied, believing it to be true; and (4) that Proctor-Russell suffered actual damage. See Soniat v. Johnson-Rast & Hays, 626 So.2d 1256 (Ala.1993).
The trial court held that the evidence supported a finding that the market representation letter was an ambiguous statement and that, once it was made, Ford had a duty to disclose its meaning. Assuming, without deciding, that the letter was ambiguous, that Ford had a duty to disclose its intent, and that in 1988 Ford had actually formed its intent to renew, or not to renew, the record, nevertheless, reveals that Proctor-Russell *399 failed to present sufficient evidence that the letter created a false impression that induced Proctor-Russell to terminate its dealer agreement. Without showing that the failure to disclose an existing material fact created a false impression upon which it relied, Proctor-Russell cannot recover on the theory that Ford breached a duty to disclose.
“The type of interest protected by the law of deceit is the interest in formulating business judgments without being misled by others — in short, in not being cheated.” Fowler v. Harper, et al., The Law of Torts § 7.1, at 378 (2d ed. 1986). Fraudulent suppression is not actionable merely because a duty to disclose existed; rather, it is actionable because “the very propositions of a party imply that certain things, if not told, do not exist.” Carry v. Sylvia y Cia, 192 Ala. 550, 560 (1915). In other words, “silence is fraudulent, because the silence amounts to an affirmation that a state of things exists which does not, and the party is deprived to the same extent that he would have been by positive assertion.” Id. (Emphasis added.)
“Moreover, the telling of a half-truth or the making of an ambiguous statement will constitute fraud if it is intended to create a false impression and does so....
“ ‘[I]f an ambiguous term is used in making a representation in a business transaction, and the other party, to the knowledge of the one making the representation, interprets the term in the sense in which it is false, there is liability for fraud if the erroneous impression created by the ambiguous representation is not corrected.’ ”
Harper, supra, § 7.14, at 472-78 (quoting Sheridan Drive-In, Inc. v. State, 16 A.D.2d 400, 228 N.Y.S.2d 576 (1962) (emphasis added).
In Smith v. MBL Life Assurance Corp., 589 So.2d 691 (Ala.1991), this Court, assuming, without deciding, that the plaintiff presented sufficient evidence that the defendants had a duty to speak, that the defendants made a false representation, and that the plaintiff had been damaged, nonetheless held that a judgment in favor of the defendant, notwithstanding the jury’s verdict in favor of the plaintiff for $4,750,000 on her fraud claim, was proper. Noting that a fraud action requires proof of reliance, we held that the plaintiff had failed to prove that she had been deceived by the false representation and had failed to prove that she had been induced to act in reliance on the defendant’s misrepresentation or that, because of such reliance, she had failed to act. Id., at 696-97.
The requirement that the plaintiff show that a failure to disclose an existing material fact created a false impression is as basic to an action alleging fraudulent suppression as the requirement that the plaintiff establish the defendant’s duty to disclose. Russell testified repeatedly that he did not know what was meant by the letter; he said he did not know if it meant that Ford would or would not renew the dealer agreement at its expiration or that it would not. In fact, Russell testified that he acted to terminate the dealer agreement because Ford would not tell him what the letter meant, and not because the letter had created a false belief that Ford did not correct.
In other words, when the plaintiff must prove fraudulent suppression, it is not sufficient to show merely that a duty to disclose existed and that the defendant, even when confronted by the plaintiff seeking the nondisclosed information, obdurately refuses to disclose. To prove fraudulent suppression, the plaintiff must show that he acted, or refrained from acting, in reliance on a false impression that the nondisclosed fact did not exist, or that he relied on his “erroneous impression created by the ambiguous representation.” See, Harper, supra, § 7.14.
Assuming it had an existing intent as to renewal or nonrenewal of Proctor-Russell’s dealer agreement, Ford’s refusal to reveal its intent even if obdurate and/or in bad faith, which refusal neither deceived nor misled Proctor-Russell, cannot support a finding of fraud. We reverse the trial court’s order denying Ford’s motion for judgment notwithstanding the verdict and remand this case to the trial court for action consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and ADAMS, HOUSTON and STEAGALL, JJ., concur.