# Supreme Court of Florida

_____

No. SC20-291

_____

**LINDA PRENTICE, etc.,**
Petitioner,

vs.

**R.J. REYNOLDS TOBACCO COMPANY,**
Respondent.

March 17, 2022

MUÑIZ, J.

As we will soon explain, this is an "*Engle* progeny" case, where an injured smoker sues a tobacco company for fraudulent concealment, conspiracy, and other tortious conduct. Today we resolve a district court conflict over what proof is required to prevail on the reliance element of those fraudulent concealment and conspiracy claims—a disagreement that has led to divergent jury instructions in *Engle* progeny cases.[1] We hold that an *Engle* progeny plaintiff must prove reliance on a statement that was made

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

by an *Engle* defendant (for a concealment claim) or co-conspirator (for a conspiracy claim) and that concealed or omitted material information about the health effects or addictiveness of smoking cigarettes.

## I.

John Price got chronic obstructive pulmonary disease after smoking multiple packs of R.J. Reynolds cigarettes a day for most of his adult life. Price sued RJR and asserted claims for strict liability, negligence, fraudulent concealment, and conspiracy to fraudulently conceal. After Price's death from COPD, Linda Prentice maintained the lawsuit as a wrongful death action.

Price and Prentice's lawsuit traces to 1994, when injured smokers filed a class action seeking damages from RJR, the other major domestic tobacco companies, and affiliated organizations for smoking-related illnesses. Our Court prospectively decertified the class in *Engle v. Liggett Group, Inc. (Engle III)*, 945 So. 2d 1246 (Fla. 2006). At the time of our decision in *Engle III*, the *Engle* trial court had completed Phases I and II of the case's three planned phases. The reader can disregard Phase II, which has no relevance to our decision today.

- 2 -

We held in *Engle III* that, notwithstanding our decision to decertify the class, individual class members like Price could choose to bring individual actions in which certain factual findings from Phase I of *Engle* would be given "res judicata effect." *Engle III*, 945 So. 2d at 1277. Those findings have come to be known as the "approved Phase I findings." The individual class member lawsuits, of which there have been thousands, are usually referred to as "*Engle* progeny" cases.

The point of an *Engle* progeny case is to litigate the plaintiff-specific reliance, causation, and damages issues that were left unaddressed by the Phase I jury. That jury "did *not* determine whether the defendants were liable to anyone." *Id.* at 1263. Instead, the Phase I findings related "exclusively to the defendants' conduct and the general health effects of smoking." *Id.* at 1256; *see also id.* at 1276-77 (listing the approved Phase I findings).

An *Engle* progeny plaintiff must first prove membership in the *Engle* class—a class consisting of Florida residents who developed a qualifying smoking-related illness by November 21, 1996, and whose illness was caused by an addiction to cigarettes containing nicotine. Upon successfully proving class membership, the plaintiff

is entitled to use the approved Phase I findings to establish the conduct elements of her *Engle* claims. *See Engle III*; *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419 (Fla. 2013) (clarifying how the approved Phase I findings were to be used in *Engle* progeny cases).

In this case, the jury first found that Price was a member of the *Engle* class. The jury then found in Prentice's favor on her claims for strict liability, negligence, and concealment conspiracy, but not for fraudulent concealment. The jury awarded Prentice $6.4 million in compensatory damages and apportioned 60% of the fault for Price's death to Price and 40% to RJR. But because the jury found in Prentice's favor on concealment conspiracy (an intentional tort), the judgment was not reduced to reflect Price's comparative fault. *See Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 305 (Fla. 2017). RJR appealed.

The First District's decision in the appeal focused on RJR's challenge to the jury instruction on Prentice's concealment conspiracy claim. By way of background, the approved Phase I findings pertinent to that claim were (1) "that the [*Engle*] defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed

to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both;" and (2) "that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment." *Engle III*, 945 So. 2d at 1257 n.4.

In addition to the approved Phase I findings, Prentice presented evidence that the

> major tobacco companies in the United States, including RJR, made fraudulent statements about the hazards of smoking as early as December 4, 1953. Over a fifty-year period, the tobacco companies concealed information about the addictive nature of nicotine and the harmful effects of smoking while engaging in marketing efforts to encourage people to smoke.

*R.J. Reynolds Tobacco Co. v. Prentice*, 290 So. 3d 963, 965 (Fla. 1st DCA 2019).

Although the approved Phase I findings sufficed to establish the conduct elements of her concealment claims, it remained for Prentice to prove the other elements of the claims, including the reliance element. As to the reliance element of her conspiracy claim, RJR had sought an instruction telling the jury that it must determine "whether Mr. Price reasonably relied to his detriment on

- 5 -

a statement that concealed or omitted material information regarding the health effects of smoking cigarettes or their addictive nature, and that was made in furtherance of" the *Engle* defendants' conspiracy. *Id.*

The trial court refused. It instead instructed the jury to determine "whether the conspiracy to withhold health information or information regarding addiction and any acts proven in furtherance of that conspiracy were relied upon by John Price to his detriment." *Id.* at 966. RJR argued that the trial court's refusal to give RJR's requested special instruction on reliance was both erroneous and prejudicial.

The First District agreed with RJR, principally on the authority of the decision in *R.J. Reynolds Tobacco Co. v. Whitmire*, 260 So. 3d 536 (Fla. 1st DCA 2018). The holding in *Whitmire* was that, to prevail on fraudulent concealment, *Engle* progeny plaintiffs "must prove detrimental reliance on fraudulent statements." *Id.* at 537. The *Whitmire* court started from the premise that the *Engle* defendants owed smokers no free-standing disclosure obligation and that the defendants' disclosure obligation would therefore have to be triggered by the defendants' statements. The court further

reasoned that, absent a plaintiff's reliance on those statements, there could be no liability for fraud. Applying the *Whitmire* court's holding, the First District here concluded that the disputed jury instruction in Prentice's case was prejudicial error because neither it nor any other instruction informed the jury of the need to find that Price had relied on a statement. To remedy the error, the district court vacated the entire judgment.

The First District's decision on the reliance issue conflicts with decisions of other district courts. Specifically, although all Florida courts agree that fraudulent concealment and concealment conspiracy claims include a reliance element, the Second, Third, and Fourth Districts have held that an *Engle* progeny plaintiff need not prove reliance on a statement. *See Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426 (Fla. 2d DCA 2017); *Philip Morris USA, Inc. v. Chadwell*, 306 So. 3d 174 (Fla. 3d DCA 2020); *R.J. Reynolds Tobacco Co. v. Burgess*, 294 So. 3d 910 (Fla. 4th DCA 2020).

We have now exercised our discretionary jurisdiction to review the First District's decision and to resolve the conflict. Each of the parties has asked us to address issues outside the conflict question, but we decline to do so. We will not address Prentice's fallback

argument that the First District erred by vacating the entire judgment, not just the verdict on the concealment conspiracy count. Nor will we take up RJR's renewed challenge to this Court's decisions, in *Engle III* and later in *Douglas*, to give "res judicata effect" to the approved Phase I findings. We apply those decisions in our opinion today, but we neither endorse them nor question their correctness.

II.

The parties have framed their dispute in clear terms. RJR says that an *Engle* progeny plaintiff must prove reliance on a statement. Prentice says that the plaintiff's burden is to prove reliance on silence. In our view, RJR is right. We hold that, to prevail on fraudulent concealment and concealment conspiracy claims, an *Engle* progeny plaintiff must prove reliance on a statement that was made by an *Engle* defendant (for a concealment claim) or co-conspirator (for a conspiracy claim) and that concealed or omitted material information about the health effects or addictiveness of smoking cigarettes. Before we explain why, we begin with three clarifying points.

First, although the jury here found RJR liable for concealment conspiracy and not for fraudulent concealment, we will discuss the two claims interchangeably. It is common ground that each claim includes a reliance element and that our answer to the question presented in this case should apply equally to each claim. *See Loeb v. Geronemus*, 66 So. 2d 241, 243 (Fla. 1953) ("The gist of a civil action for conspiracy is not the conspiracy itself but the civil wrong which is alleged to have been done pursuant to the conspiracy.").

Second, we emphasize that an *Engle* progeny plaintiff need not prove reliance on a statement that was affirmatively false on its face. It is enough for the plaintiff to prove reliance on statements that, while not necessarily false on their face, are misleading because they conceal or omit other material information. The key distinction is between making statements that are misleading by omission, on the one hand, and pure silence or a passive failure to disclose, on the other. Only the former can support fraud liability in an *Engle* progeny case.

Third, in its briefing here RJR says that reliance on "a statement" does not mean reliance on a *specific* statement—for example, a specific advertisement. RJR maintains that reliance on

"a statement" can include "a category of statements addressing a particular topic (e.g., advertisements for filtered cigarettes)." We agree that reliance on "a statement" does not require proof of reliance on "a specific statement," and our holding must be taken to include this understanding. As we will explain, what matters for purposes of reliance is that the plaintiff be able to prove a causal connection running from an *Engle* defendant's statement or statements, to the plaintiff's beliefs about the health effects or addictiveness of smoking cigarettes, to the plaintiff's injury. The statements relied upon must have been capable of causing the plaintiff to form a false belief about the health effects or addictiveness of smoking cigarettes.[2]

## A.

We said in *Hess v. Philip Morris USA, Inc.,* 175 So. 3d 687, 698 (Fla. 2015), that "*Engle*-progeny plaintiffs must certainly prove detrimental reliance in order to prevail on their fraudulent

---

2. We respectfully disagree with our dissenting colleague's assertion that our holding "disregards the concept of proof of facts by inference in our jurisprudence." Our decision today resolves a district court conflict over *whether* an *Engle* progeny plaintiff must prove reliance on a statement; it does not address *how* the plaintiff may prove such reliance.

concealment claims."  This case requires us to flesh out what that means.  We will start by discussing what reliance is and what work the reliance element does in a fraud claim.

1.

Reliance means that a plaintiff has entered a transaction in whole or in part because of the defendant's fraudulent conduct. *See* 3 Dan B. Dobbs et al., *The Law of Torts* § 671, at 665 (2d ed. 2011).  More specifically, reliance requires the plaintiff to have "received, believed, and acted upon" a misrepresentation by the defendant.  John C.P. Goldberg et al., *The Place of Reliance in Fraud*, 48 Ariz. L. Rev. 1001, 1007 (2006).  "[W]here the recipient knows the true facts that are misrepresented or for any reason does not believe the misrepresentation, he cannot be found to rely on it." 2 Fowler V. Harper et al., *The Law of Torts* § 7.13, at 465 (2d ed. 1986) (footnotes omitted).  Similarly, there can be no reliance if the plaintiff is unaware of the defendant's misrepresentation until after the transaction is complete, or if the plaintiff would have acted the same way regardless of whether the defendant had made the misrepresentation.  *See* Restatement (Third) of Torts: Liability for Economic Harm § 11 (Am. L. Inst. 2020).

- 11 -

Actionable misrepresentations are not limited to statements that are affirmatively false on their face. Fraud liability can also be premised on statements that are misleading because they omit other material information. Indeed, the common law has long recognized that the representation underlying a fraud claim can be communicated through myriad forms of conduct. *See generally* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 106 (5th ed. 1984) ("The representation which will serve as a basis for an action of deceit . . . usually consists, of course, of oral or written words; but it is not necessarily so limited.").

What matters is that the defendant intend to induce the plaintiff's reliance by creating a false impression in the plaintiff's mind. That is why our cases have made clear that, in any fraud case, the *object* of a plaintiff's reliance is a representation by the defendant. *See, e.g.*, *Am. Int'l Land Corp. v. Hanna*, 323 So. 2d 567, 569 (Fla. 1975) ("In an action for fraud and deceit plaintiff must allege (1) that defendant made a representation on which plaintiff was meant to act, (2) that the representation was false and defendant knew that fact, and (3) that plaintiff relied on the

representation to his injury."). Fraud is effected through representations.

In the common law of fraud, reliance is what establishes the necessary connection between a fraudulent representation and the plaintiff's injury. Put differently, regardless of the form of the defendant's fraudulent conduct, reliance is an indispensable aspect of proving causation in a fraud claim. "The element of reliance overlaps with (and may be considered a form of) the usual requirement in tort that a defendant's wrong be a factual or 'but for' cause of the harm that the plaintiff suffered." Restatement (Third) of Torts: Liability for Economic Harm § 11 cmt. a (Am. L. Inst. 2020); *see* Leon Green, *Deceit*, 16 Va. L. Rev. 749, 762 (1930) ("Whether the plaintiff was induced to act upon the defendant's representation is the question of causal relation in its simplest form. It is usually stated in terms of the plaintiff's reliance.").

## 2.

Against this backdrop, we can now consider the nature of the fraudulent concealment claim involved in *Engle* itself. The *Engle* class complaint had brought a single fraud count, under the heading "Fraud and Misrepresentation." *See* Amended Class Action

- 13 -

Complaint for Compensatory and Punitive Damages at 38, *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006) (No. SC03-1856). Nonetheless, class counsel persuaded the *Engle* trial court to instruct the Phase I jury on two theories of fraud: "fraud and misrepresentation" and "fraud by concealment."

The tobacco defendants had objected to giving the Phase I jury a fraud by concealment instruction, arguing that that theory of fraud depends on a disclosure obligation absent from the case. Class counsel successfully rebutted the defendants' argument by saying this to the trial court:

> And the fraud, it's clear that concealment is very important, *concealment in connection with representations or not telling the whole truth.* So that's why we put it in and that's why we feel it's important. *And we also said it made the statements misleading, because that's the point. So it is concealment, but it's simply not concealment in the abstract.* If they didn't open their mouths, if they did nothing, then [sic] would not have had, perhaps, that duty. But we don't have to address that issue because, *not only did they speak, they spoke constantly to the public; and because of that they had a duty to tell the whole truth.*

(Emphasis added.)

The *Engle* trial court eventually instructed the Phase I jury:

> On the Plaintiffs [sic] claim for fraud by concealment, the issues for your determination are:

(1), whether one or more of the Defendants *omitted or concealed material facts that would be necessary to make statements by said Defendants not misleading*;

(2), whether one or more of the Defendants knew the statement was false when it was made or made the statement knowing that said Defendants was [sic] without knowledge of its truth or falsity, or knew of the existence of material facts that were not disclosed;

(3), whether in making the false statement, or in concealing material facts, one or more of the Defendants intended that another rely on the omission or concealment.

Intentional concealment exists where a party knows of defects in a product and intentionally conceals them, or, while under no duty to speak, nevertheless voluntarily does so, but does not speak honestly or makes misleading statements or suppresses facts.

(Emphasis added.)

Later, as to "fraud by concealment," the Phase I jury answered yes to this question: "Did one or more of the Defendants conceal or omit material information, not otherwise known or available, knowing *the material* was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes?" (Emphasis added.) For the question to make sense, "the material" must be understood as

- 15 -

referring to material that the *Engle* defendants disseminated to the public.

Reading these three things together—*Engle* class counsel's argument at the Phase I charge conference, the Phase I jury instruction, and the Phase I jury finding—gives a clear picture of the *Engle* plaintiffs' theory of the *Engle* defendants' fraudulent conduct. Namely, the *Engle* plaintiffs alleged that the defendants had made statements that concealed material information about the health effects or addictiveness of smoking cigarettes, with the intention of misleading would-be purchasers of the defendants' products. This conduct breached a duty that was well established in the common law of fraud: "Though a vendor may have no duty to speak, yet 'if he does assume to speak, he must make a full and fair disclosure as to the matters about which he assumes to speak. He must then avoid a deliberate nondisclosure.'" Harper, et al., *supra* p.11, § 7.14, at 472 (quoting *Franchey v. Hannes*, 207 A.2d 268, 271 (Conn. 1965)).

### 3.

Now consider an *Engle* progeny case. These cases involve "the same causes of action between the same parties" as in *Engle*.

*Douglas*, 110 So. 3d at 432. They allow a member of the decertified class to "pick up litigation of the approved six causes of action right where the class left off." *Id.* For the reliance element of the fraudulent concealment claims, the *Engle* progeny plaintiff's burden is to prove that the defendant's fraudulent conduct—as defined in *Engle*—caused the plaintiff to form a false belief about the health effects or addictiveness of smoking cigarettes and then to act to his detriment. And as we have explained, as to fraudulent concealment, the *Engle* defendants perpetrated their fraud through incomplete statements.

The only way for an *Engle* progeny plaintiff to prove reliance (and therefore causation) is to show that he received, believed, and acted upon the statements that omitted the material information. Otherwise, the tobacco defendants' omission of information *from those statements* could not have harmed the plaintiff. It could not be said that the defendants' fraudulent conduct deceived the plaintiff. As the Restatement (Second) of Torts explains, when a defendant makes a statement that purports to tell the whole truth but does not, "there is a duty to disclose the additional information

- 17 -

necessary to prevent it from misleading *the recipient.*"  Restatement (Second) of Torts § 551 cmt. g (Am. L. Inst. 1977) (emphasis added).

The reasoning underlying our holding is straightforward.  The *Engle* plaintiffs pursued a "fraud by concealment" theory that the tobacco defendants chose to speak and then did so incompletely and misleadingly.  It was only through their incomplete statements that the *Engle* defendants were able to create a false impression in the minds of listeners.  Only recipients of the defendants' statements were capable of being deceived by those statements.  No statements, no deception, no causation.  Therefore, to prevail on a fraudulent concealment or concealment conspiracy claim, an *Engle* progeny plaintiff must prove reliance on a statement that was made by an *Engle* defendant or co-conspirator and that concealed or omitted material information about the health effects or addictiveness of smoking cigarettes.

### B.

We are unconvinced by Prentice's arguments to the contrary, starting with her assertion that an *Engle* progeny "plaintiff's burden on causation is to prove reliance on silence."  That is wrong for at least two reasons.

Analytically, the problem with Prentice's argument is that the *Engle* defendants did not have a freestanding disclosure obligation. *See generally* Restatement (Second) of Torts § 551 (Am. L. Inst. 1977); Restatement (Third) of Torts: Liability for Economic Harm § 13 (Am. L. Inst. 2020). Absent such a duty, a plaintiff is not entitled to infer any communicative content from a defendant's silence or nondisclosure. Even if we assume that there are some situations where a confidential or fiduciary relationship between the parties is such that silence could potentially communicate a tacit representation, this is not such a case. (We need not address here whether it would ever be correct to instruct a jury to determine whether a plaintiff "relied on silence.")

More concretely, Prentice's "reliance on silence" argument is utterly disconnected from the fraudulent conduct asserted in *Engle*. As we have detailed, class counsel told the *Engle* trial court that it should instruct the Phase I jury on "fraud by concealment" because "not only did [the *Engle* defendants] speak, they spoke constantly to the public; and because of that they had a duty to tell the whole truth." Prentice echoes this theme in her brief here, where she describes "a campaign of doubt unprecedented in American

history." She says that the *Engle* defendants for decades fostered a "false controversy" over the health effects and addictiveness of smoking; "attacked accurate health warnings"; used front organizations to "ventriloquize[] the conspirators' controversy message to the American public"; and even lied publicly to Congress. This is the opposite of silence.

Prentice also argues that requiring an *Engle* progeny plaintiff to prove reliance on a statement disregards the fact that, having chosen to speak, the *Engle* defendants took on a duty to disclose. But we do not question that the *Engle* defendants had a duty to disclose or that they breached that duty—the approved Phase I concealment findings require us to take those things as a given. The role of the reliance element now is to require proof that the *Engle* defendants' breach of their duty *caused* harm to the plaintiff in an *Engle* progeny case. *See Ford New Holland, Inc. v. Proctor-Russell Tractor Co., Inc.*, 630 So. 2d 395, 399 (Ala. 1993) ("The requirement that the plaintiff show that a failure to disclose an existing material fact created a false impression is as basic to an action alleging fraudulent suppression as the requirement that the plaintiff establish the defendant's duty to disclose.").

Here we emphasize that "[t]he type of interest protected by the law of deceit is the interest in formulating business judgments without being misled by others—in short, in not being cheated." Harper, et al., *supra* p.11, § 7.1, at 378. This interest is different in kind from a freestanding interest in being informed by others. The common law of fraud does not protect the latter interest.

Prentice is therefore wrong when she argues that the decisive question here is "whether the plaintiff would have behaved the same way had she known the true facts." Under that theory, it would not matter whether an *Engle* defendant's fraudulent conduct caused an *Engle* plaintiff in the first instance to form a false belief about the health effects or addictiveness of smoking cigarettes; all that would matter is whether additional disclosure by the defendants would have *cured* any such misapprehension, whatever its source. But that type of causal relationship between a defendant's conduct and a plaintiff's injury is not reliance. And Prentice's theory invites pure speculation over questions as basic as whether an *Engle* plaintiff would even have heard and given credence to additional disclosures from the *Engle* defendants.

Finally, we address Prentice's overarching contention that this Court's decision in *Engle III* to give "res judicata effect" to the Phase I "fraud by concealment" findings but not to the "fraud and misrepresentation" findings necessarily requires us to accept Prentice's position on reliance. As to "fraud and misrepresentation," the Phase I jury answered yes to this question: "Did one or more of the Defendants make a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers?" In *Engle III*, we held that this finding "cannot stand" for res judicata purposes in individual class member actions, because the finding is "nonspecific" and "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." *Engle III*, 945 So. 2d at 1255.

Prentice reads far too much into this Court's unexplained distinction between the fraud findings that we approved in *Engle III* and the ones that we did not.[3] Our Court drew this distinction on

---

3. Whatever the difference between the two might be, it is hardly self-evident. The Restatement (Second) of Torts says that the

its own, unprompted by the parties and without the benefit of argument on the point.  We adopted the distinction as a supposedly "pragmatic solution" to the perceived problem of how to decertify the *Engle* class without wasting the year-long Phase I proceedings.

Our *Engle III* opinion did not explain what made the Phase I finding on fraud by concealment sufficiently "specific," nor did our decision elaborate on how that finding was to be used in the progeny cases.  Most importantly, nowhere in *Engle III*—or in any of our *Engle* follow-on cases—did our Court express any view as to

_____

two theories of fraud are sometimes interchangeable.  *See* Restatement (Second) of Torts § 551 cmt. g, § 529 (Am. L. Inst. 1977).  And, as the Arizona Supreme Court has observed, "misrepresentation and concealment both may constitute actionable fraud, and in some cases may factually be but two sides of the same legal coin."  *Madisons Chevrolet, Inc. v. Donald*, 505 P.2d 1039, 1042 (Ariz. 1973).  This Court itself has observed that "where a failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous."  *Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985).  *See also Little v. First Cal. Co.*, 532 F.2d 1302, 1304 n.4 (9th Cir. 1976) ("The categories of 'omission' and 'misrepresentation' are not mutually exclusive.  All misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true.").  As we have already explained, even in concealment cases the defendant's fraudulent conduct must convey to the plaintiff a representation, one that is capable of being believed or disbelieved.

what an *Engle* progeny plaintiff must prove to establish the reliance element of a concealment-based fraud claim. Our obligation now is to answer that question by recourse to longstanding principles of the common law of fraud, not to invent a new, *Engle*-only law of reliance.

## C.

Against this backdrop, we readily agree with the First District that RJR's requested jury instruction on concealment conspiracy was correct and that the trial court's instruction was both erroneous and prejudicial. The trial court here instructed the jury to determine "whether the conspiracy to withhold health information or information regarding addiction and any acts proven in furtherance of that conspiracy were relied upon by John Price to his detriment and were a legal cause of John Price's death." We do not know what it means to *rely on a conspiracy*, and we doubt that the jury did, either. The jury here could reasonably have been misled into finding liability based on mere nondisclosure, without connecting that nondisclosure to Price's injury.

Similarly, it is error in an *Engle* progeny case to instruct the jury that the plaintiff can prevail on fraudulent concealment and

concealment conspiracy by proving "reliance on concealment" or "reliance on an omission." For one thing, the concept of reliance on a concealment or omission—reliance on information hidden from the plaintiff—is unavoidably confusing and maybe even nonsensical. *See duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) ("[I]n instances of total non-disclosure, . . . it is of course impossible to demonstrate reliance." (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975))). And in practical terms, by telling an *Engle* progeny jury to look for proof of reliance on a concealment or omission, a trial court erroneously invites the jury to find liability without causation.

### III.

We approve the First District's decision in the case under review, to the extent it is consistent with this opinion. We disapprove the decisions of the Second, Third, and Fourth Districts in *Duignan*, *Chadwell*, and *Burgess*, to the extent they are inconsistent with this opinion.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., dissents with an opinion.

- 25 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

Today's decision by the majority disturbs decades of settled law regarding *Engle* progeny litigation and injects uncertainty into the remaining *Engle* progeny cases. Because I cannot agree with such a fundamental shift in this Court's jurisprudence, I respectfully dissent.

In this *Engle* progeny case, the jury found in favor of Linda Prentice (Prentice), as personal representative of the Estate of John C. Price (Price), the now deceased smoker in this litigation, on Prentice's claims for strict liability, negligence, and the intentional tort of concealment conspiracy. Price, who throughout his adult life smoked multiple packs of R.J. Reynolds cigarettes per day (including during the heyday of the Marlboro Man, Joe Camel and the Old Gold Dancers), was afflicted with chronic obstructive pulmonary disease (COPD)—a disease that ultimately led to his death.

The focus of this appeal is whether Prentice was required to present direct evidence showing that Price relied on a statement

made by an *Engle* defendant to satisfy the reliance element of the concealment claims, or whether the reliance element may be inferred from the now well-known pervasive and misleading advertising campaigns pursued by tobacco companies over the years.

Until today, it was settled law in Florida that a jury in an *Engle* progeny case was permitted to infer reliance based upon evidence of the smoker's own history coupled with the tobacco industry's pervasive advertising and creation of a false controversy about the risks of smoking, without the necessity of proving that the smoker relied on any specific statement by tobacco companies. After all, *Engle* findings conclusively established that the tobacco companies agreed to conceal, omit, and misinterpret information regarding the health effects of cigarettes or their addictive nature, with the intention that smokers and the public would rely on this information to their detriment. *See Engle v. Liggett Grp., Inc.,* 945 So. 2d 1246, 1257 n.4 (Fla. 2006).

To that end, the notion of requiring proof of reliance based upon a specific statement by the tobacco industry was soundly rejected by a majority of Florida appellate courts, notably beginning

with the seminal case of *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060 (Fla. 1st DCA 2010), rendered by the First District Court of Appeal twelve years ago.  There, the First District rejected the requirement of proof of reliance based upon a statement made by an *Engle* defendant.  The court deemed the following persuasive:

> [T]he record contains abundant evidence from which the jury could *infer* Mr. Martin's reliance on pervasive misleading advertising campaigns for the Lucky Strike brand in particular and for cigarettes in general, and on the false controversy created by the tobacco industry during the years he smoked aimed at creating doubt among smokers that cigarettes were hazardous to health.

*Id.* at 1069 (emphasis added).

However, eight years after *Martin*, the First District inexplicably made a marked shift regarding what constitutes proof of reliance.  *See R.J. Reynolds Tobacco Co. v. Whitmire*, 260 So. 3d 536 (Fla. 1st DCA 2018).  In *Whitmire*, the First District held that to prevail on a claim of fraudulent concealment, "*Engle* [progeny] plaintiffs must prove detrimental reliance on fraudulent statements." *Id.* at 537.  The court stated: "The circumstantial evidence must establish individualized reliance by the plaintiff, and this cannot be shown through mere presentation of general evidence of the plaintiff's life and behavior, where, as here, that

- 28 -

evidence gives no indication that the plaintiff relied on any false information disseminated by the tobacco companies." *Id.* at 540-41.

Notably however, the First District did not recede from *Martin*, which as Judge Makar noted in his dissent, "remains applicable law." *Id.* at 542 (Makar, J., dissenting). Nonetheless, the First District's decision in *Whitmire* paved the way for the court's 2019 decision in *Prentice*, and ultimately, the conflict that the majority decides today. These decisions, though, rendered the First District an outlier among the district courts of appeal.

Since *Martin*, a majority of the district courts of appeal have rejected the requirement of reliance on a specific statement to prove fraudulent concealment. *See, e.g., Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 441-42 (Fla. 2d DCA 2017) ("[Florida] courts have refused to hold that an *Engle* progeny plaintiff must identify specific statements that he read or heard and relied upon in making a decision regarding cigarette smoking in order to prevail.").

For instance, in *R.J. Reynolds Tobacco Co. v. Burgess*, 294 So. 3d 910 (Fla. 4th DCA 2020), the Fourth District Court of Appeal noted the First District's pivot in *Whitmire* and observed that

*Whitmire* "appears to be in tension with its earlier *Martin* decision."

*Id.* at 913. The court in *Burgess* acknowledged that *Whitmire*

"found substantially similar evidence of detrimental reliance to be

insufficient as a matter of law," but determined nonetheless:

> Here, we conclude that the trial court properly denied RJR's motion for directed verdict. The plaintiff presented sufficient evidence from which the jury could *infer* that Mr. Burgess detrimentally relied upon the tobacco industry's pervasive advertising and creation of a false controversy about the risks of smoking. Mr. Burgess did not need to prove that he relied on any specific statement from the tobacco industry. Because the evidence showed that the tobacco industry delivered a fraudulent message to the smoking public, it was "*immaterial whether it passe[d] through a direct or circuitous channel in reaching*" Mr. Burgess.

*Burgess*, 294 So. 3d at 913-14 (emphasis added) (quoting *Phillip*

*Morris USA v. Naugle,* 103 So. 3d 944, 947 (Fla. 4th DCA 2012)).

Similarly, in *Philip Morris USA, Inc. v. Chadwell,* 306 So. 3d

174, 183-84 (Fla. 3d DCA 2020), the Third District Court of Appeal

acknowledged the decisions in *Whitmire* and *Prentice* but rejected

their reasoning:

> Here, the record contains sufficient evidence from which the jury could *infer* Mr. Chadwell's reliance on statements, advertisements, or omissions via the tobacco companies' pervasive misleading advertising campaigns. We reject the *Whitmire* holding to the extent it appears to require an *Engle*-progeny plaintiff to show that a smoker

explicitly relied to his detriment on specific "false or misleading statements," as opposed to a smoker's misapprehension concerning a material fact the conspirators concealed from the smoker in furtherance of their agreement to conceal or omit information regarding the health effect or addictive nature of cigarettes, as previously allowed by many Florida courts when the circumstances of a given case so warranted.

*Id.* at 184 (emphasis added).

Despite the sound reasoning set forth in these decisions, today the majority concurs with the First District's decision in *Prentice* and lays to rest any doubt about whether an *Engle* progeny plaintiff must prove reliance on a statement made by an *Engle* defendant or co-conspirator. However, in doing so, the majority not only disregards the point of the *Engle* findings, but it also disregards the importance of the concept of proof of facts by inference in our jurisprudence.

An inference, unlike a presumption, is "[a] logical and reasonable conclusion of a fact not presented by direct evidence but which, by process of logic and reason, a trier of fact may conclude exists from the established facts." *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 780-81 (Fla. 4th DCA 2006) (quoting *Black's Law Dictionary* 778 (6th ed. 1990). Whether the inferred fact is found to

exist will be decided by the trier of fact. Charles W. Ehrhardt, *Florida Evidence* § 301.1 (2021 ed.).

Proof of fact by inference is a recognized standard in Florida jurisprudence. It is often a substantial factor in the consideration of motions for directed verdicts in civil actions. For instance, in *Owen v. Publix Supermarkets, Inc.,* 802 So. 2d 315, 329 (Fla. 2001), this Court concluded that the directed verdicts in a slip and fall case at a supermarket were erroneously entered because the condition of the substance (a piece of banana) alleged to have caused the fall raised a basis for establishing the store's constructive knowledge. The Court noted that whether the aging of the banana occurred before it fell or whether the aging occurred on the floor is an issue for the jury, *as are the reasonable inferences* from the failure to sweep the floors regularly. *Id.* at 332.

In reaching this conclusion, the Court reasoned that appellate courts "reviewing the grant of a directed verdict must view the evidence and *all inferences of fact* in the light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." *Id.* at 329 (emphasis added) (citing *Frenz*

- 32 -

*Enters., Inc. v. Port Everglades*, 746 So. 2d 498, 502 (Fla. 4th DCA 1999)).

Additionally, in Florida civil cases, a jury may infer negligence when the concept of res ipsa loquitur has been established. This Court has explained:

> Res ipsa loquitur is not a substantive rule of law, but is rather a rule of evidence. It permits the jury (but not the court in a jury trial) to *draw an inference* of negligence where the instrument causing an injury is shown to have been under the exclusive management and control of the party charged with negligence, and an accident has occurred from it that under circumstances of due care would not have occurred in the ordinary course of events, except for negligent handling by the party having control of the instrument causing injury. Turner, Law of Implied Negligence, par. 1, p. 3.

*Am. Dist. Elec. Prot. Co. v. Seaboard Air Line Ry. Co.*, 177 So. 294, 296 (Fla. 1937) (emphasis added). Consistent with this language, the standard jury instruction on res ipsa loquitur provides:

> If you find that ordinarily the [incident] [injury] would not have happened without negligence,
>
> [and that the (item) causing the injury was in the exclusive control of (defendant) at the time it caused the injury,] . . .
>
> you may *infer* that (defendant) was negligent unless, taking into consideration all of the evidence in the case, you find that the (describe the event) was not due to any negligence on the part of (defendant).

Fla. Std. Jury Instr. (Civ.) 401.7 (footnote omitted) (emphasis added).[4]

Moreover, in the business litigation context, Florida courts have utilized the sanction of adverse evidentiary inferences in cases involving negligent spoliation of evidence by a party to address the lack of evidence. *Martino v. Wal-Mart Stores, Inc.*, 908 So. 2d 342, 346-47 (Fla. 2005).

So firmly ingrained is the use of inferences in our jurisprudence, that it has been codified in Florida's Evidence Code. "In 1976, presumptions were codified into the Florida Evidence Code," and they have "remained essentially unchanged." *Universal Ins. Co. of N. Am. v. Warfel*, 82 So. 3d 47, 53 (Fla. 2012). Section 90.301(3), Florida Statutes (2021), provides: "Nothing in this chapter shall prevent the drawing of an inference that is appropriate."[5]

---

4. The instruction also provides alternative language for "cases involving exploding bottles or other instrumentalities that are no longer in the defendant's control at the time of plaintiff's injury." Fla. Std. Jury Instr. (Civ.) 401.7 (Note on Use).

5. Section 90.301(4), Florida Statutes (2021), limits the application of sections 90.301-.304 to civil actions and proceedings.

Paradoxically, this Court will readily allow a conviction for first-degree murder to stand entirely on inference even though the evidentiary burdens and potential consequences in criminal cases are much greater than in civil cases.  In *Bush v. State*, 295 So. 3d 179 (Fla. 2020), where this Court abandoned the long-standing heightened standard of review applicable to convictions in death penalty cases based solely on circumstantial evidence, this Court gave great weight to the strength of jury inference.[6]  Explaining its decision, the Court stated:

> Indeed, if we were to reject the jury's verdict *and the reasonable inferences the jury must have drawn from the evidence* to reach that verdict, we would, in effect, be saying that a jury is required to entertain "a mere possible doubt, a speculative, imaginary, or forced doubt," contrary to the standard jury instructions given in all criminal cases.  *See* Fla. Std. Jury Inst. (Crim.) 3.7.

*Bush*, 295 So. 3d at 201 (emphasis added).

It defies logic to say that inference can be reliable enough to secure a criminal conviction and resulting sentence of death, but at

---

6.  "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist."  *Davis v. State*, 90 So. 2d 629, 631 (Fla. 1956).

the same time so unreliable that it can never, on its own, demonstrate reliance in the *Engle* civil context. If anything, the situation should be reversed, with inference receiving heightened scrutiny in the criminal context, and receiving some deference in the civil context.

Such deference is entirely appropriate with respect to proof of fraudulent concealment in *Engle* progeny cases. I fully agree with the Third District's conclusion in *Chadwell*, 306 So. 3d 174, that "the element of reliance can be inferred from the now well-known pervasive and misleading advertising campaigns pursued by tobacco companies over the years." *Id.* at 182. Here, Price described the impact of the tobacco industry's pervasive advertising campaign on his smoking decisions, and under any process of logic or reason, satisfied the reliance element in question.

The dissent in *Prentice* provides a clear picture of how the pervasiveness of the misleading advertising by the tobacco industry impacted not only Price's smoking decisions, but surely also the decisions of countless similarly situated persons. According to the dissent, when asked how R.J. Reynolds' advertisements injured him, Price testified that "they presented the 'Marlboro Man' as if to

'make everything look hunky-dory' and 'Joe Camel' and the 'Old Gold Dancers' who 'made [smoking] look like the thing to do, the in crowd. You're in the in crowd.' " *R.J. Reynolds Tobacco Co. v. Prentice*, 290 So. 3d 963, 969 (Fla. 1st DCA 2019) (Makar, J., dissenting).

In other words, "Mr. Price's deposition testimony (read at trial) indicates that the pervasive tobacco advertisements duped him into thinking smoking was the thing to do when the tobacco companies knew, but concealed, smoking's devastating health consequences, which is precisely the type of evidence that demonstrates detrimental reliance." *Id.* at 970. Based on this evidence, the jury was entitled to infer that the misleading advertisements detrimentally affected Mr. Price's smoking behavior, thereby establishing reliance. By requiring reliance on a specific statement, the majority has removed all permissible inferences of fact concerning the causal relationship between the tobacco industry's advertisement campaigns and the smoking decisions of *Engle* progeny plaintiffs, such as Price. In doing so, the majority has not only encroached on the exclusive province of the jury, but it has

made it virtually impossible for *Engle* plaintiffs to maintain a fraudulent concealment claim.

Because I cannot agree with such a consequential and erroneous shift in the well-established jurisprudence of *Engle* progeny litigation in our state, I respectfully dissent.

Application for Review of the Decision of the District Court of Appeal
    Direct Conflict of Decisions

    First District – Case No. 1D17-2104

    (Duval County)

Celene H. Humphries, Thomas J. Seider, and Shea T. Moxon of Brannock Humphries & Berman, Tampa, Florida; Gregory D. Prysock, Katherine M. Massa, and Antonio Luciano of Morgan & Morgan, P.A., Jacksonville, Florida, and Keith R. Mitnik of Morgan & Morgan, P.A., Orlando, Florida,

    for Petitioner

Marie A. Borland and Troy A. Fuhrman of Hill Ward Henderson, Tampa, Florida; and Jason T. Burnette, Brian Charles Lea, Stephanie E. Parker, John Walker, and Emily Baker of Jones Day, Atlanta, Georgia, Charles R.A. Morse of Jones Day, New York, New York, and Michael A. Carvin of Jones Day, Washington, District of Columbia,

    for Respondent

Christine R. Davis and Joseph H. Lang, Jr. of Carlton Fields, P.A., Tallahassee, Florida; and William W. Large of Florida Justice Reform Institute, Tallahassee, Florida,

    for Amicus Curiae Florida Justice Reform Institute

Geoffrey J. Michael of Arnold & Porter Kaye Scholer LLP, Washington, District of Columbia; and Jesse Panuccio of Boies Schiller Flexner LLP, Fort Lauderdale, Florida,

for Amicus Curiae Philip Morris USA Inc.